United States District Court
Southern District of Texas
**ENTERED**
December 08, 2020
David J. Bradley, Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

CAROLYN M. WOOD,                           §
                                           §
        Plaintiff,                         §
                                           §
V.                                         §        CIVIL ACTION NO. H-19-2738
                                           §
ANDREW SAUL, COMMISSIONER OF THE           §
SOCIAL SECURITY ADMINISTRATION,            §
                                           §
        Defendant.                         §

## MEMORANDUM AND ORDER

Pending in this social security appeal in which the parties consented to proceed before the undersigned Magistrate Judge is Plaintiff's Motion for Summary Judgment (Document No. 10) and Defendant's cross-Motion for Summary Judgment (Document No. 11). Having considered the cross motions for summary judgment, each side's response to the other's motion (Document Nos. 13 & 16), the administrative record, the written decision of the Administrative Law Judge, and the applicable law, the Court ORDERS, for the reasons set forth below, that Defendant's Motion for Summary Judgment is GRANTED, that Plaintiff's Motion for Summary Judgment is DENIED, and that the decision of the Commissioner is AFFIRMED.

## I.      Introduction

Plaintiff, Carolyn M. Wood ("Wood") brings this action pursuant to Section 205(g) of the Social Security Act ("Act"), 42 U.S.C. § 405(g), seeking judicial review of an adverse final decision of the Commissioner of the Social Security Administration ("Commissioner") denying her applications for disability insurance benefits and supplemental security income benefits. In four

claims, Wood maintains: (1) that "[t]he ALJ failed to follow SSR96-9p and 96-8p and erred in failing to find that Plaintiff's residual capacity for competitive employment is less than sedentary on a regular and sustained basis;" (2) that "[t]he ALJ erred in failing to incorporate consideration of Plaintiff's medically determinable impairments in assessing plaintiff's residual functional capacity" and "erred by improperly relying on the response of the vocational expert to a hypothetical question which was incomplete, because it failed to reflect all of plaintiff's medically determinable impairments;" (3) that "[t]he ALJ erred in failing to consider the non-exertional impairment of pain and its effects on the plaintiff's ability;" and (4) that "[t]he hearing decision does not contain an adequate evaluation of the plaintiff's Residual Functional Capacity because it fails to address limitations that would apply to lifting and carrying when standing or walking while holding a cane." The Commissioner, in contrast, maintains that there is substantial evidence in the record to support the ALJ's decision, that the decision comports with applicable law, and that the decision should be affirmed.

## II.    Procedural History

In May 2016, Wood filed applications disability insurance benefits and supplemental security income benefits, alleging that she has been disabled since December 12, 2014, due to diabetes mellitus, neuropathy, degenerative disc disease, mono-neuropathy, obesity, degenerative joint disease of the right knee, carpal tunnel syndrome, hyperlipidemia, chronic kidney disease, osteoarthritis, and diabetic retinopathy (*See* Pl.'s Br. at 1, Tr. 15 ).  After Wood's applications were denied initially and upon reconsideration, Plaintiff requested a hearing.  The ALJ, David R. Gutierrez, held a hearing on May 15, 2018 and received testimony from Wood, a medical expert ("ME") and a vocational expert

("VE"). (Tr. 37-59). On October 23, 2018, the ALJ issued his decision finding Wood not disabled (Tr. 13-30).

Wood sought review of the ALJ's adverse decision with the Appeals Council.  The Appeals Council will grant a request to review an ALJ's decision if any of the following circumstances are present: (1) it appears that the ALJ abused his discretion; (2) the ALJ made an error of law in reaching his conclusion; (3) substantial evidence does not support the ALJ's actions, findings or conclusions; or (4) a broad policy issue may affect the public interest.  20 C.F.R. § 416.1470.  On May 24, 2019, the Appeals Council found no basis for review (Tr. 1-3), and the ALJ's October 23, 2018, decision thus became final.

Wood filed a timely appeal of the ALJ's decision. 42 U.S.C. § 405(g).  Both sides have filed a Motion for Summary Judgment and been given time to respond to the other's motion.  The appeal is now ripe for ruling.

## III.    Standard for Review of Agency Decision

The court's review of a denial of disability benefits is limited "to determining (1) whether substantial evidence supports the Commissioner's decision, and (2) whether the Commissioner's decision comports with relevant legal standards." *Jones v. Apfel*, 174 F.3d 692, 693 (5th Cir. 1999). Indeed, Title 42, Section 405(g) limits judicial review of the Commissioner's decision: "The findings of  the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive."  The Act specifically grants the district court the power to enter judgment, upon the pleadings and transcript, "affirming, modifying, or reversing the decision  of the Commissioner of Social Security, with or without remanding the cause for a rehearing" when not supported by

substantial evidence.  42 U.S.C. § 405(g).  While it is incumbent upon the court to examine the record

in its entirety to decide whether the decision is supportable,  *Simmons v. Harris*, 602 F.2d 1233, 1236

(5th Cir. 1979), the court may not "reweigh the evidence in the record nor try the issues de novo, nor

substitute [its] judgment for that of the [Commissioner] even if the evidence preponderates against

the [Commissioner's] decision."  *Johnson v. Bowen*, 864 F.2d 340, 343 (5th Cir. 1988); *Jones v.*

*Apfel*, 174 F.3d 692, 693 (5th Cir. 1999); *Cook v. Heckler*, 750 F.2d 391 (5th Cir. 1985).  Conflicts

in the evidence are for the Commissioner to resolve.  *Anthony v. Sullivan*, 954 F.2d 289, 295 (5th

Cir. 1992).

The United States Supreme Court has defined "substantial evidence," as used in the Act,

to be "such relevant evidence as a reasonable mind might accept as adequate to support a

conclusion."  *Richardson v. Perales,* 402 U.S. 389, 401 (1971) (quoting *Consolidated Edison Co.*

*v. N.L.R.B.,* 305 U.S. 197, 229 (1938).  Substantial evidence is "more than a scintilla and less than

a preponderance."  *Spellman v. Shalala,* 1 F.3d 357, 360 (5th Cir. 1993).  The evidence must create

more than "a suspicion of the existence of the fact to be established, but no 'substantial evidence'

will be found only where there is a 'conspicuous absence of credible choices' or 'no contrary medical

evidence.'"  *Hames v. Heckler*, 707 F.2d 162, 164 (5th Cir. 1983).

## IV.    Burden of Proof

An individual claiming entitlement to disability insurance benefits under the Act has the

burden of proving his disability.  *Johnson v. Bowen*, 864 F.2d 340, 344 (5th Cir. 1988).  The Act

defines disability as the "inability to engage in any substantial gainful activity by reason of any

medically determinable physical or mental impairment which can be expected to result in death or

which has lasted or can be expected to last for a continuous period of not less than 12 months." 42

U.S.C. § 423(d)(1)(A).  The impairment must be proven through medically accepted clinical and

laboratory diagnostic techniques.  42 U.S.C. § 423(d)(3).  The impairment must be so severe as to

limit the claimant in the following manner:

> he is not only unable to do his previous work but cannot, considering his age,
> education, and work experience, engage in any other kind of substantial gainful work
> which exists in the national economy, regardless of whether such work exists in the
> immediate area in which he lives, or whether a specific job vacancy exists for him,
> or whether he would be hired if he applied to work.

42 U.S.C. § 423(d)(2)(A).  The mere presence of an impairment is not enough to establish that one

is suffering from a disability.  Rather, a claimant is disabled only if he is "incapable of engaging in

any substantial gainful activity."  *Anthony v. Sullivan*, 954 F.2d 289, 293 (5th Cir. 1992) (quoting

*Milam v. Bowen,* 782 F.2d 1284, 1286 (5th Cir. 1986)).

> The Commissioner applies a five-step sequential process to decide disability status:
>
> 1.    If the claimant is presently working, a finding of "not disabled" must be
>       made;
>
> 2.    If the claimant does not have a "severe impairment" or combination of
>       impairments, he will not be found disabled;
>
> 3.    If the claimant has an impairment that meets or equals an impairment listed
>       in Appendix 1 of the Regulations, disability is presumed and benefits are
>       awarded;
>
> 4.    If the claimant is capable of performing past relevant work, a finding of "not
>       disabled" must be made; and
>
> 5.    If  the claimant's impairment prevents him from doing any other substantial
>       gainful activity, taking into consideration his age, education, past work
>       experience and residual functional capacity, he will be found disabled.

*Anthony,* 954 F.2d at 293; *see also Leggett v. Chater,* 67 F.3d 558, 563 n.2 (5th Cir. 1995); *Wren v.*

*Sullivan,* 925 F.2d 123, 125 (5th Cir. 1991).  Under this framework, the claimant bears the burden of proof on the first four steps of the analysis to establish that a disability exists.  If successful, the burden shifts to the Commissioner, at step five, to show that the claimant can perform other work. *McQueen v. Apfel,* 168 F.3d 152, 154 (5th Cir. 1999).  Once the Commissioner shows that other jobs are available, the burden shifts, again, to the claimant to rebut this finding.  *Selders v. Sullivan*, 914 F.2d 614, 618 (5th Cir. 1990).  If, at any step in the process, the Commissioner determines that the claimant is or is not disabled, the evaluation ends.  *Leggett,* 67 F.3d at 563.

Here, the ALJ found at step one that Wood had not engaged in substantial gainful employment since December 12, 2014, her alleged onset date.  At step two, the ALJ determined that Wood had the following severe impairments: diabetes mellitus, neuropathy, degenerative disc disease, mono-neuropathy, obesity, and degenerative joint disease of the right knee; and the following non-severe impairments: carpal tunnel syndrome, hyperlipidemia, chronic kidney disease, osteoarthritis, diabetic retinopathy, and adjustment disorder.  (Tr. 15-16, Finding 3).  At step three, the ALJ found that Wood did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments ("Listings") in 20 C.F.R. Part 404, Subpart P, Appendix 1, including Listings 1.04, 1.02, 6.05, 6.09, and 11.14 (Tr. 17-18, Finding 4). The ALJ then determined that Wood had the residual functional capacity (RFC) "to perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a) except the claimant should avoid climbing ladders, ropes or scaffolds.  The claimant can occasionally bend, stoop, crouch, crawl, kneel, and climb ramps or stairs.  The claimant should have the option to ambulate with a cane.  The claimant could frequently reach overhead and in all directions.  The claimant could frequently handle, finger, and feel with the bilateral upper extremities.  The claimant could stand and/or walk 2 hours in an 8-hour

workday.  The claimant [could] sit for 6 hours in an 8-hour workday.  The claimant could lift 10

pounds occasionally.  The claimant should avoid concentrated exposure to vibrations."  (Tr. 18).

The ALJ then concluded, at step four, based on that RFC, that Wood could perform her past relevant

work as a budget analyst, and that she was, therefore, not disabled.  The ALJ also concluded, in the

alternative, that Wood could perform other jobs that exist in significant numbers in the national

economy, including payroll clerk and appointment clerk (Tr. 29), and that she was also not disabled

at step five.

   In this appeal, Wood argues that the ALJ erred in determining her RFC by failing to consider

her medically determinable impairments, her non-exertional impairment of pain, and her limitations

due to use of a cane.   In determining whether there is substantial evidence to support the ALJ's

decision, including his RFC assessment,  the Court generally considers four factors: (1) the objective

medical evidence; (2) the diagnosis and expert opinions of treating physicians on subsidiary

questions of fact; (3) subjective evidence of pain and disability as testified to by the plaintiff and

corroborated by family and neighbors; and (4) the plaintiff's educational background, work history,

and present age.  *Wren,* 925 F.2d at 126.   "[E]ven if supported by substantial evidence, however,

the court will not uphold the Commissioner's findings if the Commissioner reached them by

applying an erroneous legal standard." *Jackson v. Barnhart*, 271 F.2d 30, 33 (2002).  In determining

if the ALJ's decision is free of legal error, the court must "carefully scrutinize the entire record."

*Jackson*, 271 F.2d at 34 (quoting *Klug v. Weinberger*, 514 F.2d 423, 425 (1975)).  However, as

discussed, the court may not reweigh the evidence in reaching a conclusion that differs from that of

the ALJ.

V.     **Record Evidence**

Evidence from Wood's medical records indicate that she has a history of diabetes mellitus, neuropathy, degenerative disc disease, mono-neuropathy obesity, and degenerative joint disease of the right knee.  Additionally, the record indicates that Wood experienced carpal tunnel syndrome, hyperlipidemia, chronic kidney disease, osteoarthrosis, and diabetic retinopathy.  The record shows that Wood was diagnosed with diabetes type II in 2007 (Tr. 1090).  The record indicates that diabetes mellitus with neuropathy developed in 2010 (Tr. 658).

The record reveals that Wood visited her physician, Phuc X. Nguyen, M.D. more than six times in 2013. (Tr. 644-664).  These visits were primarily follow-up appointments to review Wood's diagnosis of type II diabetes and monitor her diabetic health.  (Tr. 640-644, 655-664).  The progress notes from April 25, 2013 indicated that Wood was diagnosed with carpal tunnel syndrome in February of 2013.  (Tr. 658).  Throughout 2013, in addition to the diabetes mellitus and related conditions, Wood also experienced musculoskeletal discomfort in her back, hips, and knees.  (Tr. 644-649).  On May 22, 2013, x-rays of Wood's lumbar spine and bilateral hips were taken.  (Tr. 712).  These x-rays reflected mild degenerative disc disease at L3-L4; mild fact arthropathy of the inferior lumbar spine; and bilateral mild hip osteoarthrosis (Tr. 712).

On January 3, 2014, Wood sustained a fall.  (Tr. 543).  Wood was taken to the emergency room at Memorial Hermann Northwest Hospital for evaluation. (Tr. 560).  The attending physician Osama Mohamed Elmhishi, M.D. requested an x-ray of the claimant's right knee, which indicated a moderate knee effusion but no fracture or dislocation.  (Tr. 552).  In addition, a brain magnetic resonance imagining (MRI) and echocardiogram were normal.  (Tr. 522, 567).  The carotid Doppler was also negative and the electrocardiography (EKG) showed no acute abnormality.  (Tr. 562).

8

There was no cardiovascular problem noted.  (Tr. 552).  Additionally, there was no evidence of functional loss.  Wood was discharged home with crutches, Voltaren gel and an order to follow up within one week.  (Tr. 552).

On April 7, 2014 Wood was admitted to Ben Taub General Hospital presenting with bilateral hand numbness.  (Tr. 98).  At this time Wood was utilizing wrist splints but noted that the splints did not alleviate her pain.  She indicated that steroid injections only served to exacerbate her pain. (Tr. 509).  Exams performed on April 7, 2014 did not indicate evidence of a functional loss.  The EMG reflected moderate left median mononeuropathy at the wrist, but no right median neuropathy. (Tr. 510).  Wood was discharged the same day.  (Tr. 510).  On September 15, 2014, Wood visited Ben Taub General Hospital for a follow up appointment.  (Tr. 98, 481).  Wood indicated she had ongoing hand pain, numbness and paresthesias.  She had a positive Durkan, Phalen, and Tinel's in the left upper extremity over the carpal tunnel, but her anterior interosseous nerve (AIN/PIN) and ulnar motor were intact.  (Tr. 481).  The diagnosis remained left carpal tunnel syndrome and the suggested treatment was continued use of night splints.  (Tr. 481).

On August 16, 2014, Wood presented at Memorial Hermann hospital with back pain.  (Tr. 574).  She indicated her pain was moderate in degree and in her mid-lumbar spine, right mid-lumbar spine and right flank.  (Tr. 574).  The medical record indicated no sensory or motor loss.  (Tr. 574). Upon examination, the physician noted that Wood had mildly, limited range of motion in her back (in the lumbar spine) and decreased flexion.  (Tr. 575).  There was no vertebral point tenderness or CVA (costovertebral angle) tenderness. (Tr. 575).  Wood was discharged when she showed improvement with administration of Norflex (muscle relaxer) and Naprosyn UA (nonsteroidal anti-inflammatory drug).  (Tr. 576).  She was released to her home with Flexeril and Naprosyn and told

9

to follow up with her primary care physician in two days.  (Tr. 576).

On September 27, 2015, Wood was taken to Memorial Hermann Hospital Northwest emergency room (ER).  (Tr. 607).  She complained of weakness in her left leg, numbness and tingling in her left upper arm and leg in addition to headache and mild nausea. (Tr. 607).  Wood was admitted to the hospital for observation and testing.  (Tr. 608).  During her stay, Wood underwent a assessments by an occupational therapist (OT) and physical therapist (PT).  (Tr. 60-618).  These assessments resulted in BUE (bilateral upper extremity) function and strength capabilities of occupational performance.  (Tr. 613).  During the examination, Wood did require some hand-held assistance as the assessment was performed without a cane.  (Tr. 613).  Medical records indicate that no skilled OT intervention was recommended during the visit as no deficits were identified that required skilled intervention.  (Tr. 613).  Additionally, during her hospital stay, Wood had a head CT, an EKG and a chest x-ray. (Tr. 604).  The CT did not show any evidence of mass, midline, shift, hemorrhage, extra-axial fluid collection, acute infarction, or other focal abnormal attenuation with the brain.  (Tr. 602).  The EKG indicated there was no acute process, acute ischemia and there existed a normal sinus rhythm.  (Tr. 601).  Wood's chest x-ray indicated there was no acute radiographic abnormality in her chest. (Tr. 603).  Wood was discharged home on September 29, 2015 with a directive to maintain a carbohydrate-controlled diet, no limitations on activity and to follow up with her primary care physician.  (Tr. 592).

In July of 2016, Wood was treated for stage three, chronic kidney disease, with normal urine albumin.  (Tr. 1090).  Because of Wood's prolonged use of tobacco (medical record indicates she has smoked a quarter of a pack of cigarettes daily for 37 years (Tr. 718)), she was screened for lung cancer on August 3, 2016.  The chest x-ray showed a few punctate pulmonary nodules measuring

less than 4 mm. (Tr. 636). She was advised to follow up with another chest CT in approximately one year. (Tr. 636).

Wood continued to voice discomfort about back pain on August 15, 2016. (Tr. 724). In August 2016, x-rays were taken of her lumbar spine at Casa de Amigas. (Tr. 996). The x-ray showed mild spondylosis at L4-L5 and L5-S1. (Tr. 997). The x-ray of her cervical spine did not show acute radiographic abnormality. (Tr. 996-997). On August 16, 2016 Wood had follow up appointment for her back pain at the Northwest Hospital. (Tr.723). Wood had a resultant body mass index of 28.68 kg/m2. (Tr. 726). She was alert, absent distress, orientated, and exhibited normal speech. (Tr. 726). She had an equivocal Tinel's sign and mild thenar atrophy. (Tr. 726). Wood was unable to do the Phalen's sign because it induced back pain. (Tr. 726). Her peripheral pulses were normal with no pedal edema, clubbing or cyanosis. (Tr. 726) Her HBA1C (glycated hemoglobin) was 12.4. (Tr. 726). Wood's diagnosis on this visit was stage three chronic kidney disease, diabetes mellitus with diabetic neuropathy, essential benign hypertension, tobacco abuse and depression. (Tr. 726). She was discharged home and advised to follow up in one months' time. (Tr. 728).

Wood was admitted to Memorial Hermann Northwest Hospital on December 15, 2016. (Tr. 893). She was experiencing nausea and vomiting. (Tr. 893). Additionally, Wood indicated lower abdominal cramping. (Tr. 893). During the examination she was cooperative and alert, and no focal neurological deficits were noted.   Wood did have an elevated blood pressure of 180/120 mmHg. Her peripheral perfusion was normal with no edema. (Tr. 895). Wood did present with evidence of tachycardia. (Tr. 895). The claimant's lungs were clear to auscultation with equal breath sounds. (Tr. 895). She had normal range of motion of the back and all her extremities. (Tr. 895). The claimant's abdomen was soft, with normal bowel sound, and mild tenderness in the bilateral lower

11

quadrants.  (Tr. 895).  The examination did not result in abdominal guarding or rebounding.  (Tr. 895).  Wood's electrocardiogram indicated no ST-T changes, no ectopy, and normal PR and QRS intervals.  (Tr.895).  The rhythm was sinus tachycardia and the axis was normal.  (Tr.895).  Wood's CT scan did indicate layering stones with the gallbladder lumen.  (Tr. 897).  There was no other indication of acute abnormality with her abdomen or pelvis.  (Tr. 897).  Wood was released home the same day with a diagnoses of tobacco abuse, dehydration, acute hyperglycemia, and acute diarrhea.  (Tr. 899).

On March 2, 2017 Wood, went to the Casa De Amigo Clinic for a behavioral health counseling session.  (Tr. 926).  Records indicate during this assessment there was no evidence of abnormal motor activity, delusions, hallucinations, suicidal ideations or homicidal thoughts. (Tr. 913).  Wood's thought processes were coherent and logical.  (Tr. 913).  Her insight and judgment remained good.  (Tr. 913).  She scored a 65 on the global assessment of functioning (GAF) scale, indicating some mild symptoms.  The assessment remained, as previously diagnosed, adjustment disorder with depressed mood.  (Tr. 931).

Wood had an appointment on April 4, 2017 at the Casa De Amigo Clinic for a follow up counseling session due to her adjustment disorder.  (Tr. 1003).   In this appointment, Wood received a twenty-five-minute individual psychotherapy session.  (Tr. 1003).  Her mental status examination remained within normal limits.  The results of this assessment remained adjustment disorder with depressed mood.  (Tr. 1004).

On April 17, 2017, Wood presented to the Northwest Health Clinic for a diabetic follow up exam.  (Tr. 1008).  In this appointment, Wood claimed foot and hand discomfort including throbbing and shooting pain.  (Tr. 1008).  She indicated that the pain moved to the lateral sides of her feet.  (Tr.

12

1008).  During this appointment Wood noted that she had not taken her prescribed medication, Lyrica, in about one month due to lack of a prescription refill.  (Tr. 1008).  She denied polyuria, fatigue and polydipsia.  (Tr. 1008).  Her blood pressure was 139/88. (Tr. 1009).  During this appointment, Wood was alert and oriented with normal thought content.  Her neck, chest, heart and extremity examinations were normal.  (Tr. 1009).  Wood's right middle and ring finger joints had hypertrophy, and there was tenderness of the PIP/MCPs (proximal interphalangeal/ metacarpophalangeal). (Tr. 1009).  The diagnosis from this assessment remained uncontrolled type II diabetes mellitus with diabetic polyneuropathy and neuropathy, with long-term current use of insulin and neuropathy involving both lower extremities.  (Tr.  1011).  Her prescription for Lyrica was refilled.  (Tr. 1010).  In this exam, there was no evidence of functional loss and Wood indicated that she worked out at least 30 minutes a day three times a week or more.  (Tr. 1017).

Electrodiagnostic studies performed in April 2017 revealed bilateral lower limb generalized peripheral neuropathy.  (Tr. 1044).  The test did not indicate evidence of left upper limb neuropathy or radicular symptoms.  (Tr. 1044).  Wood's left ulnar sensory nerve and motor nerve conductions were within normal limits. (Tr. 1043).

On April 20, 2017, Wood presented to the Quentin Mease Hospital with numbness in her hands and feet due to neuropathy.  (Tr. 1022).  Wood reported that her neuropathy symptoms were exacerbated with cold weather or rain, but that they improved with heating pads and medications. (Tr. 1025).  Wood had tried Lyrica, Cymbalta and Flexeril and she indicated these medications did not help.  (Tr. 1025).  The neurological assessment performed indicated that Wood was alert and oriented.  She was not suffering from aphasia, dysarthria or hypophonia.  (Tr. 1029).  Wood's upper and lower extremities flexors and extensors were 5/5 with weakness on gastrocnemius.  Additionally,

her tone was normal, her deep tendon reflexes were 2+ and symmetrical.  There were no adventitious movements.  Her sensory exam was intact to pinprick.  Wood did have decreased vibration and position sense.  Additionally, Wood's gait was normal and the Romberg was negative.  (Tr. 1029).  The final assessment of the visit was likelihood of diabetic neuropathy.  (Tr. 2019).  Wood was discharged with instructions to return for a follow up appointment in approximately 2 months.  (Tr. 1030).

Wood arrived at the psychiatric department of the Casa De Amigos Clinic on May 4, 2017 for a medication follow up appointment. (Tr. 1047).  During this appointment, Wood relayed to the doctor that she was a victim of identity theft and that her best friend's husband had recently died. (Tr. 1048).  In this assessment, she also reported being very frustrated with her pain.  (Tr. 1048).  In this exam, Wood was assessed a GAF of 55, indicating some moderate symptoms, or moderate difficulty in social, occupational, or school functioning.  (Tr. 1049).  Her mental status examination was within normal limitations and she was instructed to return for a follow up appointment in approximately six weeks.  (Tr. 1049).

On June 16, 2017, Wood presented at the Casa de Amigos Health Center for a rheumatology appointment.  (Tr. 1059).  During this visit, Wood indicated that she had increased pain in her feet, paresthesia as well as bilateral hand swelling and stiffness.  (Tr. 1060).  Her blood pressure was 150/94.  (Tr. 1061).  Her neck was supple with no adenopathy.  (Tr. 1061).   She had limited flexion and extension of the neck.  (Tr. 1061).  Additionally, the exam revealed mild pain to palpation in Wood's lumbar spine midline and paraspinal muscle spasms.  (Tr. 1061).  Wood also had positive findings in the upper extremities due to bilateral should pain.  (Tr. 1061).   Heberden's nodes were also present on Wood's DIPS's (distal interphalangeal joints) of Wood's hands.  (Tr. 1061).  The

14

assessment also indicated that Wood had bilateral knee pain and stiffness. (Tr. 1061). The examining doctor assessed her with idiopathic peripheral neuropathy, degenerative disc disease of the cervical spine and carpal tunnel syndrome. (Tr. 1061). Further it was noted that Wood needed to maintain better control over her diabetes and that this had been expressed to her multiple times. (Tr. 1071). The record further indicates that Wood refused to adjust her insulin dosing. (Tr. 1071).

On July 18, 2017 Wood presented to the Smith Clinic for a diabetes follow up appointment. During this appointment, Wood's blood pressure was 162/95, and Wood complained of worsening neuropathy, including an inability to walk, and expressed a desire to establish better glycemic (blood sugar) control. (Tr. 1090). At the time, Wood was taking Metformin and insulin for diabetes mellitus. (Tr. 1090). Noting that Wood's diet was very poor, she was instructed to refrain from smoking, to modify her diet to avoid high carb and fatty foods and to eat meals on a regular schedule. (Tr. 1094). Further, Wood was directed to switch from 70/30 insulin to Basal + GLP -1 agonist. She was additionally told to continue taking the Metformin and Lipitor and to start taking Byetta and Levemir. (Tr. 1103). As part of the July 18 visit, Wood was given a diabetic foot exam. While Wood had no foot related complaints, the exam revealed the sensation in both her right and left foot was reduced and the appearance was abnormal, but the pulses were normal. The monofilament testing was normal but there was some decreased sensation to fine touch. (Tr. 1102). The medical records of the July 18, 2017 appointment also note Wood's last A1C test from May 4, 2017. At that time, her A1C was 11.7%. (Tr. 1104). During the same May 4, 2017 visit, her LDL was 104 (trig 124; cholesterol 187; and hyperlipidemia 49). (Tr. 1104).

In July 2017, Wood underwent a retinal scan. This scan resulted in a finding of mild diabetic pathology in both the right and left eyes. (Tr. 1113). Wood was discharged with instructions to

15

perform daily foot care and to follow up with neurology for neuropathic pain control. (Tr. 1103). She was told that she needed to perform some type of physical activity despite her reports that she was unable to walk due to her neuropathy. (Tr. 1103, 1104). Her neurological exam indicated 5/5 proximal muscle strength (normal strength). (Tr. 1107). Her deep tendon reflexes were 2 + DTRs at biceps (normal). (Tr. 1107). Additionally, her cranial nerves and sensations were intact. (Tr. 1107). There was no pitting edema in her lower extremities. (Tr. 1107).

On September 5, 2017 Wood underwent a clinical interview and mental status assessment. (Tr.1116). The assessment was performed by Cecilia P. Lonnecker, Ph.D. (Tr. 1116). Wood reported in this assessment that in the previous six months she had felt somewhat mildly depressed. (Tr.1116). She indicated that she had worked for thirty-five years and could no longer do so. (Tr.1116). She indicated that she used to be very active and athletic. (Tr. 1116). She also indicated that she had been referred to a behavior specialist for counseling and found this to be somewhat helpful. (Tr. 1116). Wood noted that she had some insomnia and believed her pain contributed to her sleep problems. (Tr. 1116). She did not claim to have any suicidal thoughts, hallucinations, or delusions. (Tr. 1116). Wood also related to Lonnecker that while she lived alone, she was able to prepare herself a snack, perform household chores, go grocery shopping and manage her own finances. (Tr. 1117). Wood also noted that she can care for her own personal hygiene. She relayed to Lonnecker that she enjoyed watching football on television, went to church, had friends and was active on social media. (Tr. 1117). Lonnecker observed that Wood ambulated with a cane. (Tr. 1117). Additionally, the assessment indicated that Wood was alert; adequately sustained eye contact; spoke clearly; had coherent, logical and relevant thought processes; and was fully orientated. (Tr. 1118). Lonnecker diagnosed Wood with Adjustment Disorder with depressed mood. (Tr. 1118).

Lonnecker further found that Wood was mentally capable of working.  (Tr. 1119).

On October 24, 2017 Wood presented at the Baylor College of Medicine Medical Center for a diabetes follow up appointment.  (Tr. 1124).  Labs taken during this appointment indicated that Wood's HBA1C was 9.6, and outside the normal range.  (Tr. 1142).  The treating physician advised Wood to reduce her calorie intake, perform at home glucose monitoring and to quit smoking.  (Tr. 1140).  She was advised to return for a follow up visit in approximately three months.  (Tr. 1140).

On January 18, 2018, Wood visited the Casa de Amigos Health Center specifically indicating that she had trouble hearing with her left ear for the previous two weeks.  (Tr. 1149).  An examination of her ears indicated normal findings and her external ears were normal to inspection and palpation.  (Tr. 1151).  The right tympanic membrane was found to be normal.  (Tr. 1151). Wood's left ear was irrigated as the tympanic membrane ('TM') was not visible due to cerumen.  (Tr. 1151).  Once irrigated, the TM was discovered to be clear but bulging.  (Tr. 1151).  Wood's diagnosis remained essential hypertension, benign (stable on current regimen); type II diabetes mellitus with diabetic neuropathy; and decreased hearing of the left ear.  (Tr. 1153).  Wood was discharged with an order to utilize neomycin-colistin-hydrocortisone to treat her ear; one drop to be applied to her left ear four times daily, for five days.  (Tr. 1153).  Additionally, Wood was referred to an ENT specialty clinic.  (Tr. 1154).

During the January 18, 2018 visit to Casa de Amigos Health Center, Wood had a behavioral health and counseling session with Monica R. Prochazka, LMFT.  (Tr. 1156).  In this session/mental status examination, Wood indicated that she is still feeling depressed and not sleeping well.  (Tr. 1157).   Wood indicated that she was still living in a hotel following her displacement due to Hurricane Harvey but would be returning home in two to three weeks.  (Tr. 1156).  The exam

revealed no evidence of abnormal psychomotor activity or abnormal movements and evidence of functional loss. (Tr. 1157). Additionally, Wood was found to be cooperative, forthcoming, able to maintain good eye contract as well as normal speech rate, rhythm, and volume, and she was not suicidal or homicidal. (Tr. 1157). She was advised to return to the clinic for individual therapy sessions in approximately five weeks and to take her medications as prescribed. (Tr. 1158).

Additionally, in the January 18, 2018 Casa de Amigos visit, Wood had an appointment in the rheumatology department. (Tr. 1159). Wood presented with pain in her hands and feet, which she described as moderate. (Tr. 1159-60). On physical exam results, Wood had mild pain to palpation in the LS spine midline and paraspinal muscle spasm. (Tr. 1161). Additionally, Wood indicated pain in her left hip and limited rotation. (Tr. 1161). Lab results revealed a negative ANA screen, thus indicating certain autoimmune diseases unlikely to be present. (Tr. 1161). Wood' sediment rate was 32 mm/hr and her A1C was 12.8. (Tr. 1162). This was an increase from the 9.6 HBA1C taken October 24, 2017. (Tr. 1142). Wood's glucose level was high with a reading of 381 mg/dL. (Tr. 1142). The X-ray taken indicated stable degenerative changes of the bilateral hips. (Tr. 1163). In sum, it was determined that Wood still exhibited poorly controlled type II diabetes mellitus with neuropathy and carpal tunnel syndrome of the left wrist. (Tr. 1163). She was advised to maintain taking Cymbalta and Lyrica as prescribed, to do exercises and to take Calcium as well as a Vitamin supplement as necessary (Tr. 1163), and return for a follow up visit in two months (Tr. 1166).

On April 2, 2018 Wood was taken to the Lyndon B. Johnson Hospital emergency room (ER) suffering from chest pain, shortness of breath and ployuria. (Tr. 1169). Additionally, Wood indicated that she had bilateral posterior lower leg pain without swelling, redness or weakness. (Tr. 1173). She also informed the physician that her blood sugar had lately been in the 400's with her

18

baseline being in the 200's.  (Tr. 1173).  Lab results from this visit indicated her troponin was 0.00 (normal), but her glucose level was 378 mg/dL and her blood urea nitrogen (BUN) was 21mg/dL. (Tr. 1173).  The chest x-ray taken did not reveal a pulmonary embolism and the electrocardiogram (ECG) administered did not reveal any other acute abnormality in the chest.  (Tr. 1179).  There was also no evidence of DKA (diabetic ketoacidosis). (Tr. 1192).  Wood was given aspirin but indicated several hours after her arrival to the ER that she still had chest pain.  (Tr. 1185).  She was given morphine to help with chest pain.  (Tr. 1185).  Approximately one hour later, Wood indicated that there was no improvement to her pain level. (Tr. 1185).  After assessment of her status, Wood was admitted for care.  (Tr. 1214).  She was given another ECG (electrocardiogram), which revealed continued, normal results. (LVEF 65-69%).  (Tr. 1198, 1218).  The stress test administered was negative.  (Tr. 1218).  Her physical exam indicated her motor strength was 5/5 for all extremities bilaterally.  (Tr. 1218).  Her tone was noted as normal.  (Tr. 1218).   Her mental status, cranial nerves, and sensation were intact.  (Tr. 1218).  Her reflexes were recorded as normal and symmetric with good bilateral muscle strength.  (Tr. 1218).  Upon initial arrival, Wood was tachycardic in ED to 110.  (Tr. 1218).  Her blood pressure was normalized and she was started on Lisinopril 5.  (Tr. 1219).  Wood was discharged home in stable condition the following day, April 3, 2018.  (Tr. 1217, 1219).  She was advised to continue the Lisinopril and to take a macrobid for the next seven days to combat her urinary tract infection (UTI).  (Tr. 1219).  She was given nitroglycerin and also advised to schedule a follow up appointment with her primary care physician with the following one to two weeks.  (Tr. 1219).   The final diagnosis upon discharge was chest pain (Tr. 1222).

## VI.    Discussion

Wood raises four issues in her motion for summary judgement that center around the claim that the ALJ erred in his evaluation of her residual functional capacity and erred in his decision that she could engage in sedentary work on a regular and sustainable basis, thus finding her not disabled. (Pl.'s Br. 3-6).  To evaluate these arguments, the Court must analyze whether the ALJ applied the correct legal standards in his evaluation and whether there exists substantial evidence to support his assessment of Wood's residual functional capacity and his ultimate decision that Wood is not disabled.

The ALJ explained in his written decision the following process he utilized to make an RFC assessment:

> After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a) except the claimant should avoid climbing ladders, ropes or scaffolds.  The claimant can occasionally bend, stoop, crouch, crawl, kneel, and climb ramps or stairs.  The claimant should have the option to ambulate with a cane. The claimant could frequently reach overhead and in all directions.  The claimant could frequently handle, finger, and feel with the bilateral upper extremities.  The claimant could stand and/or walk 2 hours in an 8-hour workday.  The claimant could sit for 6 hours in an 8-hour workday.  The claimant could lift 10 pounds occasionally. The claimant should avoid concentrated exposure to vibrations.

> In making this finding, I have considered all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence, based on the requirements of 20 CFR 404.1529 and 416.929 and SSR 16-3p.  I have also considered opinion evidence in accordance with the requirements of 20 CFR 404.1527 and 416.927.

> In considering the claimant's symptoms, I must follow a two-step process in which it must first be determined whether there is an underlying medically determinable physical or mental impairment(s)—i.e., an impairment(s) that can be shown by medically acceptable clinical or laboratory diagnostic techniques—that could reasonably be expected to produce the claimant's pain or other symptoms.

Second, once an underlying physical or mental impairment(s) that could reasonably be expected to produce the claimant's pain or other symptoms has been shown, I must evaluate the intensity, persistence, and limiting effects of the claimant's symptoms to determine the extent to which they limit the claimant's function limitations. For this purpose, whenever statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms are no substantiated by objective medical evidence, I must consider other evidence in the record to determine if the claimant's symptoms limit the ability to do work-related activities.

To properly determine whether substantial evidence exists to make an assessment, four factors must be weighed by the ALJ. This Court must then determine if the ALJ gave proper deference to all four factors in making his finding of Wood's residual functional capacity and final designation of not disabled. *Wren*, 925 F.2d at 126. As discussed in Section IV, Burden of Proof, the court considers the following four factors: (1) the objective medical evidence; (2) the diagnosis and expert opinions of treating physicians on subsidiary questions of fact; (3) subjective evidence of pain and disability as testified to by the plaintiff and corroborated by family and neighbors; and (4) the plaintiff's educational background, work history, and present age. *Wren,* 925 F.2d at 126.

This process aligns with that required under the Regulations. As for Wood's specific complaints, none have any merit when considered in connection with the objective medical evidence, the diagnosis and expert opinions, Wood's subjective evidence of pain and disability, and Wood's vocational factors.

A.      **The Objective Medical Evidence**

The objective medical evidence, outlined above, reveals generally mild or moderate symptoms, some progressive neuropathy, and poorly controlled diabetes, none of which indicates or suggests that Wood's RFC is less than that determined by the ALJ. While Wood complains that the ALJ did not make specific findings about whether she could perform each of elements of the RFC on a continued or sustained basis, nothing in the objective medical evidence indicates that such specific findings were warranted. Wood's impairments are not generally the type to "wax and wane," and nothing in the objective medical evidence indicates that Wood, at any period of time,

21

could not perform work related activities at the restricted range of sedentary work found by the ALJ in his RFC.  The objective medical evidence factor, therefore, supports the ALJ"s RFC, and his resultant disability determination.

**B.      Diagnoses and opinions of treating and examining physicians**

The diagnoses and expert medical opinions in the record also support the ALJ's RFC and his resultant disability determination.  Wood was seen by Dr. Cecilia Lonnecker for an clinical interview and mental status examination in September 2017.  Dr. Lonnecker determined that Wood had an adjustment disorder, but was nonetheless "mentally capable of working."  (Tr. 119).  Dr. Robert Sklaroff, an impartial medical expert who reviewed Wood's medical records, testified at the administrative hearing that Wood has a history of diabetes mellitus, carpal tunnel syndrome, degenerative disc disease of the lumbar spine, neuropathy, and kidney disease related to her diabetes mellitus, but that none of these impairments would more than "minimally affected her life." (Tr. 44). State agency physicians, who reviewed Wood's medical records, also concluded that Wood was not disabled by her impairments.  The ALJ's RFC in this case, for a restricted range of sedentary of sedentary work, was significantly more restrictive than that opined about by any of the medical experts.  As such, the diagnosis and expert medical opinion factor also supports the ALJ's RFC, and his resultant disability determination.

**C.      Subjective evidence of pain**

In his assessment, the ALJ is required to consider all the claimant's symptoms including subjective evidence of pain.  *Wren v. Sullivan*, 925 F.25 123, 128 (1991).  Where a claimant indicates medical impairment-related symptoms, the ALJ is required to evaluate those symptoms, including pain, in a two-step process.  SSR 16-3p, 2017 WL 5180304.  The ALJ must first

contemplate whether there exists an underlying medically determinable impairment that could be reasonably expected to produce the alleged subjective symptoms; and then determine, by evaluating the intensity and persistence of those symptoms, the extent to which the symptoms limit a claimant's ability to perform work-related activities.   To properly evaluate the intensity and persistency of any symptom alleged by a claimant, the ALJ is required to:

> examine the entire case record, including the objective medical evidence; an individual's statements about intensity ,persistence, and limited effects of symptoms; statements and other information provided by medical sources and other persons; and any other relevant evidence in the individual's case record.

*Id.*

Here, despite Wood's complaints, the ALJ's decision shows that the ALJ properly considered and assessed Wood's subjective symptoms of pain. Not only did the ALJ thoroughly discuss Woods's medical records and her complaints of pain therein, he explained throughout his decision why her found her complaints to not be consistent with the medical record and other evidence in the record.   Accordingly, this factor also supports the ALJ's RFC and his resultant disability determination.

## D.   Age, education and work history

The fourth factor considered is the claimant's educational background, work history and present age.  A claimant will be determined to be disabled only if the claimant's physical or mental impairments are of such severity that he is not only unable to do his previous work, but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy.  42 U.S.C. § 423(d)(2)(a).

Here, Wood was fifty-four (54) years old on her alleged onset date of December 12, 2014,

she had three years of college classes, and past work experience as a budget analyst.  After having determined that Wood could engage in a limited range of sedentary work, the ALJ inquired of a vocational expert whether a person of Wood's age, education and past work experience could, within the restricted range of sedentary work found, perform her past work, or any other work that exists in significant numbers in the regional and national economy.   The vocational expert testified that such a person could perform their past relevant work as a budget analyst, as well as other work such as payroll clerk and appointment clerk (Tr. 55-58).

Wood does not take issue with the vocational expert's testimony, and tacitly appears to agree that such testimony can suffice as substantial evidence to support the ALJ's determination at steps four and five.  What Wood contests is the ALJ's RFC, which she believes should have less than sedentary, and the ALJ's failure to incorporate limitations in the RFC that would take into consideration her non-severe impairments as well as her use of a cane.  Both the ALJ and the vocational expert took into account Wood's use of a cane, and the ALJ concluded, based on the vocational expert's testimony, that Wood's use of a cane would not interfere with her ability to perform the jobs of budget analyst, payroll clerk, and appointment clerk (Tr. 58).  As for Wood's complaints that the RFC did not take into account her non-severe impairments, including, most particularly, her carpal tunnel syndrome, which affects her ability to handle and finger items, there is nothing in the record, other Wood's own subjective complaints, that would support any additional limitations in the RFC.  Wood complained of finger pain and numbness in 2014, which was diagnosed as carpal tunnel syndrome.  She wore splints on her wrists but did not have any type of surgery.  In 2017, there are notes of tenderness and hypertrophy in some of Wood's fingers, but she was concomitantly found to have normal function and normal strength.  Upon this record, where the

24

only evidence in the record that would support any additional limitations in the RFC come from Wood's own subjective complaints, which the ALJ adequately addressed, the vocational factors and the vocational expert's testimony support the ALJ's RFC and his resultant disability determination.

## VII.    Conclusion and Order

Based on the foregoing, and the conclusion that all the factors to be considered weigh in favor of the ALJ's decision, that the ALJ did not err in his consideration of the evidence, and that substantial evidence supports the ALJ's RFC and his disability determination, it is

ORDERED that Defendant's Motion for Summary Judgment (Document No. 11) is GRANTED, Plaintiff's Motion for Summary Judgment (Document No. 10) is DENIED, and  the decision of the Commissioner is AFFIRMED.

Signed at Houston, Texas, this 8th day of December, 2020.

Frances H. Stacy
United States Magistrate Judge